IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**MCCOY 6 APARTMENTS, LLC**,
a West Virginia limited liability company,

Case No. 09-00304

**AUGUSTA APARTMENTS, LLC**, a
West Virginia limited liability company,

Chapter 11

The Honorable Patrick B. Flatley

**KRISTIAN E. WARNER,**

**BENJAMIN F. WARNER,**

Adversary No.

**ANDREW M. WARNER,** and

**MONROE P. WARNER,**

       Plaintiffs,

    v.

**CITY OF MORGANTOWN, WV**

**DANIEL BOROFF,** individually and in his
capacity as City Manager of the City of
Morgantown,

**DAVID FETTY,** individually and in his
capacity as Fire Chief of the City of
Morgantown,

**KENNETH TENNANT,** individually and in
his capacity as Chief Fire Marshal of
the City of Morgantown,

**TERRY RINEHART,** individually and in
his capacity as Deputy Chief Fire Marshal
of the City of Morgantown,

**PATRICK PICKENPAUGH,** individually
and in his capacity as Deputy Fire Marshal
of the City of Morgantown,

**JASON QUINN,** individually and in his
capacity as Deputy Fire Marshall of
the City of Morgantown,

**TERRY HOUGH,** individually and in her capacity as City Engineer of the City of Morgantown,

**MICHAEL STONE,** individually and in his capacity as Chief Code Enforcement Officer of the City of Morgantown,

**DAVID FRIEND,** individually and in his capacity as Code Enforcement Officer of the City of Morgantown,

**TYE POLING,** individually and in his former capacity as Code Enforcement Officer of the City of Morgantown,

        Defendants.

## ADVERSARY COMPLAINT

AND NOW come the Plaintiffs, McCoy 6 Apartments LLC, a West Virginia limited liability company, Augusta Apartments, LLC, a West Virginia limited liability company, Kristian E. Warner, Benjamin F. Warner, Andrew M. Warner and Monroe P. Warner, by and through their attorneys, Robert O Lampl, John P. Lacher, James R. Cooney and Elsie R. Lampl, and set forth this their Complaint in Civil Action, whereof the following is a statement:

## I.    INTRODUCTORY STATEMENT

1.    The Plaintiffs are four brothers, adult individual citizens of the State of West Virginia, and several limited liability companies of which they are the members and through which they conduct business in the State of West Virginia. From 1979 to the present, the Plaintiffs have been engaged in the business of acquiring, developing and managing residential housing and commercial properties within West Virginia,

including a large amount of residential student housing situate within the limits of the City of Morgantown.

2. Commencing in approximately mid-2006 and continuing to the present, the Defendants, municipal officials of the City of Morgantown, have engaged in a conscience-shocking pattern and practice of harassment, intimidation, retaliation and punishment of the Defendants intended to injure them financially by depriving them of their property without just compensation or due process of law. This conduct, done under color of State Law, has taken the form set forth hereunder in detail and has been perpetrated and/or encouraged by the Defendants acting in their official and/or individual capacities.

3. The conduct involves, *inter alia*: (1) the use of repetitious and excessive Fire and Building Code inspections; (2) the issuance of excessive, vague and arbitrary Code violation citations; (3) the imposition of harsh, unnecessary and unreasonable remediation orders; (4) the use of verbal remediation orders in lieu of written orders; (5) the capricious use of condemnation orders to wrongfully deprive the Plaintiffs of valuable grandfathered property rights; (6) the imposition of multiple, inconsistent and/or improper Code standards; and (7) the failure to provide any effective means of appeal or judicial redress of the foregoing. This conduct has been used to effectuate a taking of the Plaintiffs' property without just compensation and in violation of their Constitutional rights to due process and equal protection of the law.

4. The Defendants' practices, procedures and conduct, as more fully detailed in the body of this Complaint, are violative of, *inter alia,* the Plaintiffs' rights, as secured by the Civil Rights Act of 1871, 42 U.S.C. § 1983, insofar as that statute creates causes

of action to enforce rights guaranteed by the Bill of Rights to the United States Constitution.

5.    The Plaintiffs bring this action for the purpose of obtaining relief from the Defendant City Officials' harassment and to enforce their rights as citizens of the United States to peaceably enjoy their property and pursue their legitimate business concerns free of the malicious interference of local government employees acting in concert with and/or with the acquiescence of elected public officials and certain banks and/or bank officials.

6.    The Plaintiffs seek an award of declaratory and injunctive relief, monetary damages and such other relief, including an award of costs and attorney's fees, as is necessary and appropriate to ensure and effectuate their federal civil rights.

## II.    **JURISDICTION**

7.    The Court's jurisdiction to adjudicate the Plaintiffs' federal claims is premised on 28 U.S.C. §§ 1331 and 1334, which give Federal District Courts jurisdiction over federal questions, as well as the authority to award appropriate relief from the violation, under color of state law, of any constitutional rights or federal statute providing for the protection of civil rights.

## III.    **PARTIES**

8.    The Plaintiff is McCoy 6 Apartments, LLC, a West Virginia limited liability company with a registered address at 49 Falling Run Road, Morgantown, WV 26505.

9.    The Plaintiff is Augusta Apartments, LLC, a West Virginia limited liability company with a registered address at 49 Falling Run Road, Morgantown, WV 26505.

10.     The Plaintiff is Kristian E. Warner, an adult individual residing at 2044 Lakeside Drive, Morgantown, WV 26508. At all times material hereto, Kristian E. Warner was and is an owner and member of McCoy 6 and Augusta.

11.     The Plaintiff is Benjamin F. Warner, an adult individual residing at 14 Turtle Creek, Morgantown, WV 26508. At all times material hereto, Benjamin F. Warner was and is an owner and member of McCoy 6 and Augusta.

12.     The Plaintiff is Andrew M. Warner, an adult individual residing at 3110 Greystone Drive, Morgantown, WV 26508. At all times material hereto, Andrew M. Warner was and is an owner and member of McCoy 6 and Augusta.

13.     The Plaintiff is Monroe P. Warner, an adult individual residing at 2567 University Avenue, Morgantown, WV 26505. At all times material hereto, Monroe P. Warner was and is an owner and member of McCoy 6 and Augusta.

14.     The Defendant is the City of Morgantown, a governmental subdivision of the State of West Virginia, with offices situate at 389 Spruce Street, Morgantown, WV 26505.

15.     The Defendant is Daniel Boroff, with an address c/o Office of the City Attorney of Morgantown, 389 Spruce Street, Morgantown, WV 26505. At all times material hereto, Daniel Boroff was and is the City Manager of the City of Morgantown and acted in that, as well as his individual, capacity. Upon information and belief, Boroff has overall supervisory authority over the various governmental agencies, departments and subdivisions comprising, in the aggregate, the government of the City of Morgantown.

16.     The Defendant is David Fetty, with an address c/o Office of the City Attorney of Morgantown, 389 Spruce Street, Morgantown, WV 26505. At all times material hereto, David Fetty was and is the Fire Chief of the City of Morgantown and acted in that, as well as his individual, capacity.

17.     The Defendant is Kenneth Tennant, with an address c/o Office of the City Attorney of Morgantown, 389 Spruce Street, Morgantown, WV 26505. At all times material hereto, Kenneth Tennant was and is the Chief Fire Marshal of the City of Morgantown and acted in that, as well as his individual, capacity.

18.     The Defendant is Terry Rinehart, with an address c/o Office of the City Attorney of Morgantown, 389 Spruce Street, Morgantown, WV 26505. At all times material hereto, Terry Rinehart was and is the Deputy Chief Fire Marshal of the City of Morgantown and acted in that, as well as his individual, capacity.

19.     The Defendant is Patrick Pickenpaugh, with an address c/o Office of the City Attorney of Morgantown, 389 Spruce Street, Morgantown, WV 26505. At all times material hereto, Patrick Pickenpaugh was and is the Deputy Fire Marshal of the City of Morgantown and acted in that, as well as his individual, capacity.

20.     The Defendant is Jason Quinn, with an address c/o Office of the City Attorney of Morgantown, 389 Spruce Street, Morgantown, WV 26505. At all times material hereto, Jason Quinn was and is the Deputy Fire Marshal of the City of Morgantown and acted in that, as well as his individual, capacity.

21.     The Defendant is Terry Hough, with an address c/o Office of the City Attorney of Morgantown, 389 Spruce Street, Morgantown, WV 26505. At all times

material hereto, Terry Hough was and is the City Engineer of the City of Morgantown and acted in that, as well as her individual, capacity.

22.     The Defendant is Michael Stone, with an address c/o Office of the City Attorney of Morgantown, 389 Spruce Street, Morgantown, WV 26505. At all times material hereto, Michael Stone was and is the Chief Code Enforcement Officer of the City of Morgantown and acted in that, as well as his individual, capacity.

23.     The Defendant is David Friend, with an address c/o Office of the City Attorney of Morgantown, 389 Spruce Street, Morgantown, WV 26505. At all times material hereto, David Friend was and is a Code Enforcement Officer of the City of Morgantown and acted in that, as well as his individual, capacity.

24.     The Defendant is Tye Poling, with an address c/o Office of the City Attorney of Morgantown, 389 Spruce Street, Morgantown, WV 26505. At all times material hereto, Tye Poling was a Code Enforcement Officer of the City of Morgantown and acted in that, as well as his individual, capacity. Upon information and belief, Defendant Poling's employment with the City of Morgantown was terminated following a plea bargain resolving criminal charges filed against him for impersonating a police officer.

## IV.     **FACTUAL BACKGROUND**

*The Plaintiffs commence their most ambitious development to date, the construction of a 158 apartment unit project known as The Augusta. Under deadline to complete construction and obtain a certificate of occupancy in time for the return of students to school, the Warners push hard for Fire and Building Code approvals, triggering a retaliatory backlash*

25.     Plaintiffs Kristian E. Warner, Benjamin F. Warner, Andrew M. Warner and Monroe P. Warner (collectively the "Warners") are the members of several West Virginia

limited liability companies, including, *inter alia,* Plaintiffs McCoy 6 Apartments, LLC ("McCoy 6") and Augusta Apartments, LLC ("Augusta"). McCoy 6 and Augusta are the owners of substantial real estate holdings located within the City of Morgantown, West Virginia (the "City").

26. At all times material hereto, McCoy 6's holdings included, *inter alia,* a tract of real property in Morgantown with structures situate thereon known as "Mountaineer Court" and "Beechurst". Mountaineer Court consists of two large residential apartment buildings comprising 32 total units. Beechurst consists of several adjacent multi-unit structures joined under one roof. Augusta's holdings include, *inter alia,* a tract of real property in Morgantown containing a new 296 bedroom apartment student residential housing complex known as "The Augusta". The three complexes are used primarily for leasing housing to students and others associated with West Virginia University.

27. The Warners are four brothers, natives of West Virginia, who have been engaged in the business of purchasing, rehabilitating, renovating, constructing and/or developing residential housing in the Morgantown area from approximately 1979 until the present. Historically, the Warners' business model involved the acquisition and management of pre-existing residential buildings ranging from single-family houses to multi-unit apartment buildings. Exceptions to this practice took place in approximately 1994, when the Warners constructed Mountaineer Court, and again in 2007, with the construction of The Augusta.

28. For most of the decades they have been engaged in business, the Plaintiffs have maintained a functional business relationship with the government of the City of Morgantown, including its Code Enforcement Department and Fire Department.

That relationship underwent a startling transformation commencing with the construction of The Augusta on or about mid-December 2006.

29.     The circumstances which gave rise to the instant Complaint began in mid-2006 when Augusta commenced the development and construction of a new 158 apartment unit student residential housing complex in Morgantown known as "The Augusta." Augusta submitted a detailed development plan and time-sensitive construction schedule to the appropriate City departments.

30.     The Plaintiffs aver that the City's Building Code and Fire Code personnel were ill-equipped and unprepared to deal with a project as complex as The Augusta, and had to be prodded by Augusta and the Warners to open their respective plan packages, review the documents and give their approvals.

31.     Ultimately then-Chief Fire Marshal Max Humphries reviewed and approved Augusta's development plan. Augusta re-confirmed the plan review and approval prior to the departure of Mr. Humphries in December 2006. Nonetheless, upon Mr. Humphries' retirement, his successor, Chief Fire Marshal Kenneth Tennant, acting in concert with Defendant Fire Chief David Fetty, and officials of the City's Building Code Enforcement and Fire Departments, adopted and initiated an improper and unlawful pattern and practice of retaliation against the Plaintiffs that involved harassing Augusta development and project personnel and imposing previously undisclosed, costly, unnecessary and excessive changes to previously-approved plans. The result of this conduct was to delay the completion, and substantially increase the cost of the development, of The Augusta.

32.     Defendant Tennant commenced the foregoing scheme under the guise of a "re-review" of the approved development plan. Subsequent to his re-review, Defendant Tennant, acting in concert with Defendant Fetty and the other Defendants, implemented this scheme as follows: (1) by requiring Augusta to make a number of costly changes to the approved plans, including, *inter alia,* additional doors in stairways, stairway pressurization fans, etc.; (2) by engaging in a pattern and practice of soliciting publicity and thereafter providing negative, one-sided, incomplete, inaccurate and misleading accounts of the City's dealings with Augusta to local media; and (3) by publicly disparaging the Warners in local media. By way of illustration, on August 15, 2007, Defendant Michael Stone invited a photographer from the Morgantown Dominion Post newspaper to escort him during the final inspection of The Augusta prior to the issuance of its Temporary Occupancy Permit. This practice of inviting media participation in the performance of official duties was unprecedented and intended to embarrass the Plaintiffs.

33.     Once the requirements for the Temporary Certificate of Occupancy had been determined with finality, the City's harassment of Augusta continued, with Fire Marshal inspections routinely occurring in the middle of the night, despite Fire Code provisions calling for inspections to take place at reasonable hours. The harassment continued to the extent that the Plaintiffs were required to maintain security on a 24 hour basis to ensure that the City's Building and Fire Code enforcement officers did not concoct a pretext to conduct another middle-of-the-night inspection and falsely allege that Augusta failed to comply with the City's Code provisions, as determined by the Defendants.

34.    By way of example, on one occasion, and despite the presence of security personnel onsite to secure the construction zone, Augusta officials were cited for inadequate security precautions when two students pulled down the construction fence installed by Augusta, trespassed on the property, smoked a cigarette and sat on a bulldozer.

35.    In a final effort to deprive the Plaintiffs of the timely opening of The Augusta, City Officials imposed additional unreasonable and unprecedented demands requiring engineering fill to satisfy proof rolling requirements necessary to complete the streetscape installation after they had agreed to a schedule for completion of the hardscape by August 1, 2007. Augusta's contractor averred that the City's requirements were excessive, unreasonable and unprecedented, even in projects he had undertaken for the West Virginia Department of Highways. The result of the foregoing conduct by the City Officials was to delay completion of The Augusta so as to jeopardize Augusta's ability to complete the project in time for the return of students to the WVU campus.

36.    Augusta was forced to incur substantial and unnecessary added costs in excess of $500,000 in order to comply with the requirements imposed after the approval of their development plan, and was further required to take extraordinary measures to compel City Officials to perform their duties, conduct the necessary inspections and issue approvals necessary to complete the Augusta on time. Ultimately, and despite the resistance of the Defendants, Augusta completed the project in time to honor the residential leases it entered into with students and others returning to West Virginia University for the new school year.

37.     The Plaintiffs aver that the Defendants were angered and/or embarrassed by the Plaintiff's timely completion of The Augusta, particularly where they had publicly and conspicuously expressed doubts regarding the Plaintiffs' ability to complete the project. A representative of the Plaintiffs was actually told by a municipal official to "wait 'til next time...we'll show you who's in control." The Plaintiffs aver that the Defendant City Officials then decided upon the retaliatory course of conduct against the Plaintiffs outlined below to punish the Plaintiffs by imposing unnecessary and impossible conditions upon McCoy 6's operation and management of another residential student housing property, Mountaineer Court. The result of this course of conduct, well known to the Defendant City Officials, was the forced divestiture of the Plaintiffs' possession, control and ownership of Mountaineer Court.

### The City of Morgantown Fire Department's Fire Code Enforcement Unit evolves into an autonomous entity, exceeding and abusing its Statutory Authority and Powers

38.     Unbeknownst to the Plaintiffs and most of the general public, but well known to the Defendant City Officials, the City of Morgantown's Fire Department had undergone a substantial evolution in the years prior to the events regarding The Augusta.

39.     These changes commenced following the appointment of Defendant David Fetty as Fire Chief in approximately 1997. Fetty has publicly stated his belief that the Morgantown Fire Department requires additional manpower, and in 1999 submitted an ambitious proposal to the Morgantown City Council calling for the construction of 1 new fire station, the reopening of the fire training center fire station and the hiring of twelve additional firefighters. When City Council didn't respond quickly enough, Fetty

voiced his complaints to the media, whereupon City Council appointed a committee in 2005 to address Fetty's concerns and evaluate his proposals.

40.     After conducting several meetings and with due consideration, the committee made its recommendations to the City Manager, Defendant Daniel Boroff: (1) the immediate hiring of 1 firefighter; (2) the hiring of three additional firefighters in two years; (3) the hiring of three additional firefighters in another two years. The committee also reduced the request for two new fire stations to one, to be centrally located to protect the north end of Morgantown.

41.     Upon receipt of the committee's recommendations, Boroff authorized the hiring of no new firefighters and no new fire stations, but did authorize the hiring of two new fire inspectors, commenting that by better enforcement of fire code standards, the City could prevent fires, and thereby obviate the need for more firefighters.

42.     Fetty, unhappy with the downsizing of his recommendations by the committee, and further angered by the disposition of the committee's recommendations by Boroff, determined that if rigorous inspections and strict adherence to the Fire Code was what the City wanted, that is exactly what it would get.

43.     Despite the fact that Fetty had never requested any additional fire inspectors, yet had gotten two per the recommendations of the committee, Fetty requested yet another. Fetty further authorized unlimited overtime for Fire Code inspections, and further authorized "middle of the night" inspections. Fire inspectors who formerly had to report their overtime hours to their duty officers now were instructed to report directly to Fetty. Upon information and belief, the Plaintiffs aver that Fetty has

never failed to approve overtime for Fire Code inspectors, for whom there are no formal job descriptions, and the scope of whose authority is essentially limitless.

44. Further, upon information and belief, Fetty conceals this overtime within the Fire Department budget by including it with several other items (big fires, special manning, etc.) designating as "other", despite the fact that an estimated 95% of these "other" budget items are overtime costs for Fire Code inspectors. These overtime funds are further supplemented by the fines included within citations written for alleged Fire Code violations. In essence, Fetty has established a small coterie of Fire Code inspectors as a department-within-a-department with unlimited jurisdiction, accountable only to him and with a direct profit motive for conducting inspections and issuing citations.

45. The four inspectors serving under Fetty, Defendants Kenneth Tennant, Terry Rinehart, Jason Quinn and Patrick Pickenpaugh, have amassed an unprecedented number of complaints for, *inter alia,* inspections taking place at all hours of the day and night; rude and offensive language and conduct; issuing excessive and retaliatory citations; targeting specific properties and/or owners for enforcement actions and inspections; serial enforcement of inconsistent provisions of not less than three Fire Codes; and enforcing Fire Code provisions not adopted by the State of West Virginia.

46. Not satisfied with his authority being confined to the Fire Department, Fetty next set his sights on the City of Morgantown's Building Code Enforcement Department, attempting to bring its personnel and functions within his jurisdiction and consolidate all Code enforcement within the City of Morgantown under his authority.

The immediate target of Fetty's ambition was Defendant Terry Hough, whose authority as City Engineer extends over six departments while Fetty has authority over but one.

47.     In furtherance of his goal, Fetty approached both Defendant Boroff and the Morgantown City Council to gather support for his proposed Code enforcement consolidation; both rebuffed his efforts.

48.     Intensifying his efforts, Fetty thereafter directed the Fire Department to conduct follow-up inspections to inspections already conducted by the Code Enforcement Department. In addition to inspecting for Fire Code violations, the Fire Department inspectors were instructed to concentrate on finding any potential Building Code violations that Code Enforcement may have overlooked or chosen to waive, all for the purpose of making the Code Enforcement inspectors appear to be inept or lax. Defendant Tennant went so far as to purchase a copy of the State Building Code so that he could familiarize his Fire Department inspectors on what standards the Code Enforcement inspectors were to enforce. Fetty persisted in this effort to gain control over all Code Enforcement powers in Morgantown, even in the face of resistance from the City Council, until City Manager Boroff was required to intervene.

49.     In an effort to end the internecine fighting, Boroff instructed Fire Department and Code Enforcement inspectors to carry out joint inspections, rather than the serial rival inspections that were occurring with increasing frequency.

50.     The net effect of the foregoing was to unleash a wave of competing and rival Code enforcement agencies on the property owners of Morgantown, enforcing each and every Fire and Building Code provision to the maximum, issuing excessive Citations, levying excessive fines and requiring onerous remediation efforts, all in an

effort to avoid being made to appear lax by the rival agency. Despite a veritable torrent of complaints and protests from aggrieved property owners, Defendant Boroff refused to stop the practice.

51. As an element of his plan to usurp power and authority, Fetty, acting on his own authority, implemented a new building permit process requiring contractors to obtain not only the customary building permit from Code Enforcement, but an additional building permit from the City Fire Marshal's Office.

52. In fact the requirement that contractors must obtain a second building permit from the Fire Department was instituted unilaterally by the Fire Department without City Council approval, City Manager approval, public comment or public notice. Contractors who had worked in the City of Morgantown for years were now told by inspectors that they needed two permits to do work. The Plaintiffs aver that the Fire Department was able to skirt the requirement of city administration approval by not charging any fee for the Fire Department permit; nonetheless, any contractor found to lack the Fire Department permit was issued a stop work order until said permit was obtained. Further, the Ordinances of the City of Morgantown provide for a Fire Prevention Board to be comprised of City Manager Boroff, City Engineer Hough and Fire Chief Fetty. The purpose of the Fire Prevention Board is to review practices and procedures employed by the Fire Department and evaluate their costs and benefits in light of the laudable goal of preventing unnecessary fires in Morgantown. Because of the foregoing feuds and rivalries, however, the Fire Prevention Board has ceased to function, permitting Fetty to operate without oversight or approval. The Fire Prevention

Board rarely, if ever, meets, produces no minutes, follows no agenda and takes no action.

53.     The abusive and excessive inspection practices instituted by the Fire Department and joined by the Code Enforcement Department is so widespread that Morgantown property owners have found themselves in a dilemma whereby they face a choice between complying with excessive and outrageous Code citations, fines and remediation orders or risking retaliation and even worse treatment by Fetty, Tennant, Pickenpaugh, Quinn and Rinehart. Retaliation against those who have questioned the tactics and procedures being employed with respect to Code inspections in Morgantown have taken the form of utility meters being pulled, properties being condemned and occupants being evicted from buildings without warning. Further retaliation often occurs in the form of protracted delays in the Fire Department dispatching personnel to inspect and certify a cited condition as having been remediated. Particularly egregious, and widespread, is the Fire Department's practice of one inspector ordering costly remediation work, e.g., the installation of custom-sized steel fire doors, with which the property owner has no choice but to comply, only to be told by a subsequent inspector that the work was unnecessary after all.

54.     Upon information and belief, Fetty has directed that Fire Code inspection and enforcement matters are not to be discussed at Fire Department Staff Meetings, attended by Chief Fetty and the Fire Department Captains, because minutes are taken and kept of those meetings and Fetty does not want any record maintained as to the substance of discussion regarding these matters, even among the members of the Fire Department.

55.     Fetty convenes regular meetings with his four Fire Code inspectors; however, no minutes are taken at these meetings and no public record exists as to what is discussed at these meetings.

56.     To minimize the effect of persons lodging complaints regarding the conduct of the Fire Department Code inspectors, Fetty unilaterally determined that all such complaints must be in writing. Despite the fact that City Manager Boroff instructed Fetty that the Fire Department was to investigate all complaints regarding its Code inspectors, Fetty simply chose to ignore Boroff.

57.     In order to dissuade property owners from lodging complaints against the Fire Department Code inspectors, Fetty directed the Fire Department to begin tape recording all telephone lines into the Fire Department. All conversations are recorded, despite the fact that callers are not informed that the conversations are being tape-recorded. Notwithstanding the fact that all telephone conversations are recorded, Fetty has persisted in directing the Fire Department to investigate no complaint not in writing, even complaints regarding ethics violations alleged against certain of the Fire Department Code inspectors.

58.     While Fetty has insisted that Morgantown property owners comply to the letter with each and every provision of the City Fire Code, the Fire Department has itself serially violated that Code, as is set forth in, *inter alia,* the following instances:

        A.      Section 1.7.3.1 calls for the AHJ (authority having jurisdiction, i.e., the Fire Chief and Fire Code inspectors) to render interpretations of the Fire Code and to make and enforce rules and supplemental regulations in order to carry out the application and intent of its provisions. Section 1.7.3.2 calls for the AHJ to make such

interpretations, rules and regulations available to the public during normal business hours. Despite the foregoing, no such interpretations, rules and regulations are available to the public, even upon specific request. In addition, Fetty, Tennant, Pickenpaugh, Rinehart and Quinn routinely cite inconsistent Fire Code standards, and issue inconsistent remediation orders, based on unknown and varying Fire Code standards set forth in not less than three different Fire Codes.

    B.  Section 1.7.6 provides that the AHJ may conduct inspections subject to a specific set of guidelines:

    1.  Section 1.7.6.1 provides that the inspections are to occur at all reasonable times, and are to be focused on detecting dangerous or hazardous conditions or materials as set forth in the Fire Code;

    2.  Section 1.7.6.2 provides that the AHJ shall have the authority to order persons to remove or remedy such dangerous or hazardous condition or material;

    3.  Section 1.7.6.3 provides that the AHJ engaged in fire prevention and inspection work shall be authorized to the fullest extent permitted by law at all reasonable times to enter and examine any building, structure, marine vessel, vehicle or premise for the purpose of making fire inspections;

    4.  Section 1.7.6.4 provides that before entering any of the foregoing, the AHJ shall obtain the consent of the occupant thereof or obtain a court warrant authorizing entry for the purpose of inspection except in those instances where an emergency exists;

5.     Section 1.7.6.5 defines emergency as "circumstances that the AHJ knows, or has reason to believe, exist and that can constitute immediate danger to life and property";

6.     Section 1.7.7 provides that "where conditions exist and are deemed hazardous to life and property by the AHJ, the AHJ shall have the authority to summarily abate such hazardous conditions as are in violation of the Fire code. Despite the foregoing, Fetty has directed inspections to take place at any time of day or night, directed his inspectors to enter upon premises with or without the knowledge and/or consent of the property owner or occupant, and routinely used false and bad faith averments of the existence of an "emergency" to justify the imposition of harsh and draconian measures to punish property owners in disfavor with Fetty.

59.     Fetty has targeted specific areas, and specific properties, for inspections and enforcement actions, while excluding other areas and/or properties from similar inspections and enforcement actions, even when the properties to be included and excluded were proximate or adjacent. By so doing, Fetty can unilaterally mete out punishment to those property owners whom he holds in disfavor, while insulating those whom he holds in favor from such treatment.

60.     Fetty has boasted that his favored means of cloaking his actions, as aforesaid, is to aver that he is "just doing his job", and that any property owner challenging his actions must be opposed to the health and safety of the residents of Morgantown or is seeking to shirk its duties with respect to said health and safety.

61.     The rival, competing inspections conducted by the Code Enforcement and Fire Departments of the City of Morgantown have served to victimize the rental property owners of Morgantown, and in particular the Plaintiffs, as set forth herein.

*Unsuccessful in their efforts to derail the completion of The Augusta, the Defendants commence a campaign of harassment and intimidation focusing on Mountaineer Court in an effort to deprive the Plaintiffs of their property*

62.     From the time The Augusta was completed, and continuing until the present with Mountaineer Court and Beechurst, municipal officials of the City of Morgantown, including members of its Building Code Enforcement Department and Fire Department (collectively the "City Officials") have engaged in a concerted pattern and practice of harassment of the Plaintiffs by engaging in, *inter alia,* the following conduct:

A.     the random, inconsistent, arbitrary and capricious issuance of excessive Building and Fire Code violation citations;

B.     the failure to utilize consistent standards of plan approval, said standards varying with changes in the personnel responsible for issuing said approval;

C.     the failure to issue Building and Fire Code violation citations containing specific references to the Code section allegedly violated, together with the steps considered necessary to remediate said violations;

D.     the failure to negotiate in good faith the remediation steps required, and a reasonable and practical schedule for the completion of the remediation demanded;

E.     the failure to give building owners notice of their appeal rights with respect to Building and Fire Code violation citations;

F.    the inconsistent and discriminatory application of Building and Fire Code provisions as between favored owners and contractors and those in disfavor;

G.    the bad faith use of stop work orders to harass and delay the remediation measures undertaken by owners and contractors in disfavor;

H.    the bad faith use of Emergency Abatement ordinances to force the evacuation of the tenants of buildings alleged to violate Building and Fire Code provisions;

I.    the arbitrary and capricious issuance of excessive and unnecessary remediation orders and requirements unrelated to the alleged Code violation;

J.    the application of incorrect or erroneous standards in determining remediation requirements;

K.    the issuance of vague and imprecise Building and Fire Code violation citations and the issuance of vague and imprecise remediation orders;

L.    the issuance of pretextual Building and Fire Code violation citations to retaliate against and punish owners and/or contractors in disfavor;

M.    the deprivation of vested grandfathered Building and Fire Code requirements and the application of Building and Fire Code standards applicable to new construction by the foregoing use of pretextual Building and Fire Code violation citations;

N.    the failure to provide a meaningful appeals process with respect to asserted Building and Fire Code violations;

O.    the failure to fully implement the provisions of the State Building Code as adopted by the City of Morgantown, particularly as they relate to a meaningful

appeals process to challenge alleged Building and Fire Code violation citations and City-ordered remediation requirements; and

      P.    The use of multiple Fire Code provisions and the issuance of inconsistent Fire Code remediation orders.

      63.    The foregoing conduct of the City Officials was intended to punish and injure the Plaintiffs by imposing a relentless series of unnecessary and excessive delays and costs upon the Plaintiffs, with the direct, foreseeable and intended effect of depriving Plaintiff McCoy 6 Apartments, LLC of the custody, control and ownership of Mountaineer Court.

      64.    As is set forth in greater detail hereunder, the Defendants have actively participated in the unlawful advancement of this improper scheme to injure and damage the Plaintiffs by engaging in a conscience-shocking persecution of the Plaintiffs through the circumvention of standard Code Enforcement procedures, manipulation of the Code Enforcement system, the repeated initiation of knowingly improper and meritless Building and Fire Code enforcement proceedings against them, including the prosecution of baseless allegations of criminal conduct and the failure and/or refusal to provide any effective mechanism for appeal or judicial review of the foregoing.

      65.    The effect of the Defendants' conduct upon the Plaintiffs in the aggregate has been to unfairly malign the character of the individual Plaintiffs, to disparage and cause damage to their reputation and to cause egregious monetary injury and damage to the Plaintiffs.

      66.    Although the Plaintiffs have acted, and continue to act, in good faith to timely and fully remediate such Code violation citations as are necessary and proper,

the Defendant City Officials have persisted in their discriminatory and calculated abuse of local municipal ordinances and land use laws. As set forth in detail hereunder, the actions of the Defendant City Officials have deprived the Plaintiffs of any meaningful appeals process and imposed substantial and excessive costs upon the Plaintiffs.

67. By way of example, the Defendant City Officials declared that Mountaineer Court was unfit for human habitation and represented an imminent threat to the health and safety of the occupants due to alleged "substantial deterioration" of structural supports underlying and supporting exterior walkways that surround the buildings.

68 At the time of the determination, the structural supports were not visible, but rather were covered by soffit and fascia. The determination was therefore not based upon direct observation, but rather upon presumed conditions extrapolated from a small sample of structural supports located in close proximity to a few leaking drains.

69. The Defendant City Officials ordered Plaintiff McCoy 6 to remediate the condition by tearing off the exterior walkways and structural supports in their entirety and reconstructing them, which work was estimated to cost in excess of $500,000.

70. Subsequent to the issuance of the foregoing remediation order, the soffit and fascia covering the structural supports were removed, disclosing the fact that over 95% of the structural supports were in pristine condition and showed no signs of deterioration whatsoever.

71. The Defendant City Officials have failed and/or refused to implement an appeals mechanism whereby property and building owners such as the Plaintiffs can seek redress for code violations and/or remediation orders issued improperly or in bad faith.

72.     On or about September, 2008, the Plaintiffs, confronted with City Official-mandated remediation orders requiring an estimated $500,000 or more to complete, contacted a representative of the bank holding a mortgage on the Mountaineer Court property, Fifth Third Bank (the "Bank"), and informed said representative, Bridget Ziegler ("Ziegler"), of both the foregoing actions by the City Officials and the anticipated costs of compliance.

73.     The Plaintiffs further requested that the Bank consider funding the remediation efforts in order to enable the Plaintiffs to maintain McCoy 6's loan in a current status. Failing that, the Plaintiffs noted that in the interim it had no choice but to fund the remediation internally, thereby placing severe stress on its resources.

74.     Despite the readily apparent fact that the structural supports of the Mountaineer Court exterior walkways are not substantially deteriorated, and the fact that the order requiring them to be removed and reconstructed is patently absurd and unnecessary, the Defendant City Officials persisted in enforcing said order, in the process imposing unnecessary costs upon and causing substantial disruption and damage to McCoy 6's financial condition and reputation.

75.     Contemporaneously, the City Officials were pressuring McCoy 6 to adhere to a schedule for completing the remediation efforts, while simultaneously erecting roadblocks to the same. As set forth above, an entire exterior staircase constructed by McCoy 6 to specifications provided by the City Officials was inspected. Upon inspection the City Officials determined that they had provided the Plaintiffs with the wrong specifications. The Plaintiff was ordered to dismantle the staircase and construct a new one or install costly modifications.

76.    The City Officials thereafter approved professionally engineered plans submitted by McCoy 6 calling for 2" x 6" floor joists, which were built and installed in accordance with the approved plans. Upon inspection by the City Officials *after* the stair towers were built, the City Officials stated that 2" x 10" floor joists *should* have been used for constructing the stair towers. McCoy 6 rebuilt the staircases using the now-required 2" x 10" floor joists, but, upon inspection by the City Officials, McCoy 6 was cited for a Building Code violation for having an overhead height clearance shortfall of 4" to the stairway landings, the very condition caused by the City Officials' remediation change order.

77.    The effect of the Defendants' conduct was to deprive the Plaintiffs of the ability to timely serve their debt obligations to the Bank while simultaneously satisfying the City Officials' ravenous appetite for costly remediation measures, thereby endangering the Plaintiff's relationship with the Bank. On or about October, 2008, having received no funds from the Bank, the Plaintiffs applied for a $2.4 million loan with another bank, First United Bank ("First United"), which application was approved in October. The City Officials were made aware of this loan application and its approval.

78.    The Defendant City Officials were aware of the fact that the Plaintiffs required additional funds to be able to pay both the current debt service and the remediation efforts ordered by the City Officials. The City Officials were aware that as a result of the damage to its financial condition caused by their conduct, McCoy 6 was unable to pay its mortgage to the Bank for September, October and November, 2008. The Plaintiffs were required to direct all of their financial resources to funding the City Officials remediation orders.

79.     When informed of the nature of the City Official's conduct, and the efforts by the Plaintiffs to comply in order to complete the remediation, Ziegler indicated that she had been in contact with the City Officials and that they wanted to see a "change in control" of Mountaineer Court. Ziegler further indicated that she concurred if that was what was required by the City Officials in order to stop the harassment of the Plaintiffs.

80.     The Plaintiffs, interpreted "change in control" to reference a change in the control of the construction/remediation efforts, and proposed Donald Dempsey, who has served as the Project Manager for The Augusta, to assume control of all remediation work at Mountaineer Court. Further, in the face of the deteriorating relationship between the Plaintiffs and the City Officials, the Plaintiffs utilized Ziegler as a go-between to facilitate discussions with the City Officials.

81.     Throughout November, 2008, the Plaintiffs and the Bank proposed an "Asset Management Plan" to the City Officials, whereby the Bank would oversee the remaining work necessary to complete remediation efforts, in effect assuming "control" of the work, while permitting the Plaintiffs to continue to manage its property. The Plan was the practical result of the Plaintiffs being informed that the City Officials were demanding that they be removed from control of the remediation work as a condition precedent to ceasing and desisting in their conduct as aforesaid.

82.     During the pendency of these negotiations, the City Officials further intensified their efforts to disrupt and delay McCoy 6's adherence to its remediation work schedule by issuing threats to condemn Mountaineer Court and to impose another work stoppage order if the work schedule were not maintained. Despite the foregoing,

McCoy 6 continued in good faith its attempts to complete the ever-changing remediation orders imposed by City Officials.

83.     In addition, the City Officials escalated another demand, now insisting that the Plaintiffs agree to a "change in ownership" of Mountaineer Court as a condition precedent to offering any accommodation to the onerous remediation work and schedule requirements imposed on the Plaintiffs.

84.     On or about December 5, 2008, the Bank, despite being aware that the Plaintiffs had secured new financing to enable them to bring and maintain current McCoy 6's obligations and complete remediation work, notified the Plaintiffs that it was convinced that nothing less than a change in ownership would end the City Official's continued harassment. The Bank then announced that it would no longer proceed with the Asset Management Plan, but would instead seek the appointment of a Receiver in three days.

85.     The Bank thereafter filed a Complaint on December 17, 2008 seeking the appointment of a Receiver.

86.     Also on December 17, 2008, the Plaintiffs learned of a meeting between Ziegler and the City Officials scheduled for December 18, 2008 to discuss Mountaineer Court. The Plaintiffs were expressly NOT invited to the meeting.

87.     On December 18, 2008, Ziegler attended the meeting with City Officials, arriving at 9:00 a.m. and departing at 9:17 a.m. The City Officials informed Ziegler unequivocally that absent a change in ownership, the City Officials would keep up their relentless pressuring of the Plaintiffs.

88. Later on December 18, 2008, at a hearing on the Bank's request, the Circuit Court refused to appoint a receiver, and instead scheduled a hearing for February, 2009. Unable to obtain the appointment of a Receiver, Ziegler purported to agree to reconsider the Asset Management Plan.

89. The Plaintiffs, in a desperate effort to end the unconscionable conduct of the City Officials, were able to obtain a letter from one such City Official purporting to outline what would be required to be set forth in a letter from a representative of the Bank in order to obtain the City Official's cooperation in the completion of the Mountaineer Court remediation work.

90. Ziegler stated that she would agree to provide the aforementioned letter, conditioned upon McCoy 6 and the individual Warner Plaintiffs executing a Forbearance Agreement calling for a conditional Receivership Order, to be activated only upon a breach of the Forbearance Agreement. In the event the Plaintiffs did not execute the Forbearance Agreement and the conditional Receivership Order, the Bank threatened to commence foreclosure proceedings and compel a judicial sale of Mountaineer Court to protect its collateral.

91. Under compulsion and duress as a result of the conduct of the City Officials, but in the belief that the City Officials would act in good faith to reach an accommodation that would enable the Plaintiffs to conclude the remediation work without jeopardizing McCoy 6's ownership and control over its property, the Plaintiffs entered into an agreement with the Bank whereby they would execute the Forbearance Agreement and the (provisional) Receivership Order conditioned upon the Bank providing the letter requested by the City Officials. The Plaintiffs did so in the belief that

the City Officials would deal in good faith with the Bank, on behalf of the Plaintiffs, to determine the proper scope of necessary remediation work and to provide adequate time for the completion of such remediation work as was necessary while preserving the Debtor's ultimate ownership and control of Mountaineer Court.

92. On December 23, 2008, the Plaintiffs executed the Forbearance Agreement and the Receivership Order. The Forbearance Agreement provided for the entry of an order providing for, *inter alia,* the appointment of a Receiver *only in the event the City Officials should thereafter condemn more than five units of Mountaineer Court.*

93. On December 24, 2008, Ziegler issued a letter to McCoy 6, which was hand-delivered by one of the Plaintiffs to the City Officials. On December 26, 2008, Mr. Dempsey met with the City Officials, who indicated that the letter from Ziegler had been rejected as totally inadequate.

94. In addition, the City Officials refused to accept any responsibility for delays to the remediation work schedule. Further, upon a specific request for an extension of the work schedule, the City Officials produced a December 19, 2008 Memorandum from Defendant Tennant to Defendant Boroff that conditioned any such approval on: (1) the submission of a letter from the Bank "documenting their acquisition of control" (of Mountaineer Court) by December 26, 2008; (2) the construction of a second stairway or the completion of a dry sprinkler system prior to the return of students from their Christmas break on January 12, 2009; (3) the new "property controllers" must advise all occupants in writing that no parties are permitted outside of the apartment units and that interior occupancy must not exceed one person per 200 square feet; and (4) the Bank must submit a revised construction schedule to the City Officials by December 26, 2008,

*the day the Memo was first disclosed to the Plaintiffs.* This last condition should be viewed in light of the date the Plaintiffs were given a copy of this Memo and the holiday voice mail greeting at the City Fire Department stating that no one would be available until December 29, 2008.

95. Finally, and ominously, the City Officials demanded that the Plaintiffs *immediately* deliver to them a copy of the Forbearance Agreement and Receivership Order.

96. On December 29, 2008, immediately after the Christmas weekend, the City Officials, acting through both the City Fire Department and Building Code Enforcement Departments, conducted consecutive inspections of Mountaineer Court and issued orders reinstating the condemnation of Mountaineer Court in its entirety.

97. Among the subjects of the inspection was the status of the stairtower which had undergone specification changes subsequent to construction, and remediation in lieu of reconstruction. Said remediation involved the use of steel splice plates to reinforce the joints where the structural supports columns to the stairtowers joined. One stairtower required the installation of 12 steel splice plates.

98. At the time of the reinspection, McCoy 6 had installed eleven ("11") of the required twelve ("12") steel splice plates. The installation of the twelfth splice plate had been overlooked but the splice plate was on site. McCoy 6 installed the twelfth splice plate while the City Officials were still on site.

99. The Defendant City Officials cited the "missing" twelfth splice plate as one of the major examples of McCoy 6's alleged failure to implement the City Official's remediation orders, and refused to acknowledge the installation of the last steel splice

plate despite having actual knowledge of the installation even before the Defendant City Officials left the premises. As a result of the refusal of the City Officials to approve the new stairtower, Mountaineer Court was deemed to be missing a necessary means of ingress and egress from and to the premises.

100. Subsequent to said inspections, Defendant Pickenpaugh issued an Imminent Danger Evacuation Order, asserting that "the City Fire Marshal's Office has determined that conditions and practices in this occupancy pose an immediate danger that could reasonably be expected to cause death, serious physical harm, or serious property loss. This hazardous condition presents an immediate danger to building occupants..."

101. Incredibly, and despite the foregoing language, the Order failed to identify *any* specific condition alleged to have constituted said imminent danger.

102. In fact there was *no* condition at Mountaineer Court constituting *any* threat to the health or safety of the occupants of Mountaineer Court. At the time the condemnation and Evacuation Order were issued, the City Officials knew that the result of the condemnation and evacuation orders would be the compulsory turnover of Mountaineer Court to a Receiver.

103. On January 5, 2009, the City Officials requested confirmation from the Bank that as a result of the foregoing condemnation and the issuance of an Imminent Danger Evacuation Order, McCoy 6 would be stripped of possession, custody, control and ownership of Mountaineer Court under the Forbearance Agreement and the Receivership Order, and a Receiver installed.

104. At the time of the foregoing, little or none of the conditions in existence at the time the City Officials issued the condemnation and the Imminent Danger Evacuation Order had been altered in any way. Nonetheless, the City Officials, satisfied that they had succeeded in their effort to oust the Plaintiffs from possession, custody, ownership and control of their property, simply determined to afford the successor contractor more reasonable and accommodating treatment than, and impose different conditions from, that which had been afforded to the Plaintiffs.

105. On January 5, 2009, the Bank presented the Receivership Order to the Circuit Court as a *fait accompli*, thereby depriving the Plaintiffs of possession, custody, control and ownership of their own property.

106. Following the turnover of Mountaineer Court to a Receiver (a competitor of the Plaintiffs), a new contractor was retained to perform work on the site. The contractor performed a limited amount of work over approximately 48 hours, whereupon the City Officials reinspected Mountaineer Court, assessed the work done by the Receiver's contractor and determined that no condition existed such as to render the buildings unfit for human habitation or an imminent threat to the health and safety of the occupants thereof. The City Officials further provided the Receiver both a generous schedule to complete further work as well as a conditional occupancy permit - both of which the City Officials had denied to McCoy 6 and the individual Plaintiffs.

107. Within 72 hours of the appointment of the Receiver, the City Officials stayed the condemnation, lifted the Imminent Danger Evacuation Order and issued a provisional occupancy permit allowing reoccupancy of Mountaineer Court, despite the fact that the conditions at the property remained substantially unchanged. The Plaintiffs

allege that the actual condition of the property was a secondary concern to the City Officials, and that the condemnation and Order were concocted and issued in bad faith for the express purpose of facilitating the ouster of the Plaintiffs. Mountaineer Court apparently was only considered by the City Officials to pose a significant risk to the safety and health of its occupants so long as the Plaintiffs remained in possession and control. This contradictory and disparate treatment is typical of the treatment the Plaintiffs have been accorded at the hands of the City Officials.

108.　As evidence of the foregoing, at the written request of legal counsel for McCoy 6, the Defendant City Officials, accompanied by a structural engineer, conducted a reinspection of the structural supports of Mountaineer Court to determine if there was any need for the exterior walkways to be torn off and reconstructed.

109.　The structural engineer found no sign of substantial deterioration of the structural supports of the exterior walkways of Mountaineer Court, no threat to the health and safety of the occupants of the buildings and no evidence that the bearing capacity of the structural supports was in any way inadequate or unsafe.

110.　The Defendant City Officials have attempted to conceal the results of the structural engineer's report and have refused to publicly disclose the report or its findings.

111.　Upon information and belief, the Plaintiffs aver that the Defendant City Officials have privately rescinded the requirement that the exterior walkways of Mountaineer Court be removed and reconstructed, and have communicated that rescission to prospective purchasers of Mountaineer Court, but have refused to publicly confirm the foregoing – in essence enforcing an extraordinarily harsh remediation

standard against McCoy 6 while enforcing a wholly different and relaxed remediation standard against other individuals and entities.

112. In sum, the foregoing conduct of the Defendant City Officials was so egregious and ongoing that it resulted in the McCoy 6's principal lender, Fifth Third Bank, filing suit to terminate McCoy 6's ownership of Mountaineer Court, in the belief that said termination was the only way it could receive assurances from the Defendant City Officials that the value of its collateral would be free from further assault. Ultimately due to the foregoing actions of the Defendants, McCoy 6 was forced to transfer its ownership of Mountaineer Court to Fifth Third Bank, resulting in a loss to it in excess of $2 million.

## VI.    LEGAL CLAIMS

### FIRST CAUSE OF ACTION – CIVIL RIGHTS - SUBSTANTIVE DUE PROCESS
### (As to All Defendants)

113. The Plaintiffs have a constitutionally-protected right to the peaceable ownership, possession, use, enjoyment and control of and/or over their property.

114. The Defendants, through the arbitrary, capricious, hostile, malicious and conscience-shocking treatment of the Plaintiffs, as more fully described in the factual section of this Complaint, have deprived and continue to deprive the Plaintiffs of their substantive due process rights, said rights being guaranteed by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

### SECOND CAUSE OF ACTION – CIVIL RIGHTS - EQUAL PROTECTION
### (As to All Defendants)

115. The Defendants have intentionally, and without lawful or rational basis, singled the Plaintiffs out and subjected them to land use and building and fire code

enforcement standards, procedures and proceedings not applicable to others in the general population similarly situate.

116. The disparate treatment to which the Plaintiffs were subjected, as more fully described in the factual section of this Complaint, violated the Plaintiffs' right to the equal protection of law, said right being guaranteed by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

### THIRD CAUSE OF ACTION – CIVIL RIGHTS - MALICIOUS PROSECUTION
### (As to Defendants Stone and Poling)

117. The Defendants initiated and pursued multiple proceedings of an administrative and/or quasi-criminal and/or criminal nature against the Plaintiffs, without lawful cause.

118. The Defendants knew or should have known that their initiation and pursuit of said proceedings against the Plaintiffs lacked proper cause.

119. These proceedings, in which certain of the Plaintiffs were charged with criminal conduct relating to the re-occupancy of Mountaineer Court by several students, unknown to the Plaintiffs and contrary to express postings by the Plaintiffs, were initiated against the Plaintiffs maliciously and/or for purposes other than the legitimate enforcement of law.

120. The Plaintiffs so charged were the prevailing parties in the criminal proceedings initiated against them by the Defendants, and were exonerated of any criminal liability.

121. The Plaintiffs have suffered and continue to suffer tangible losses of protected property and/or liberty interests as a result of the baseless proceedings initiated against them.

122. The initiation and pursuit of the afore-referenced proceedings against the Plaintiffs deprived them of rights, privileges and immunities guaranteed them by the United States Constitution and 42 U.S.C. § 1983.

## FOURTH CAUSE OF ACTION – CIVIL RIGHTS - ABUSE OF PROCESS
### (As to Defendants Fetty, Pickenpaugh, Quinn, Tennant, Rinehart, Stone, Friend, and Poling)

123. The Defendants initiated and pursued multiple and baseless proceedings of an administrative and/or quasi-criminal and/or criminal nature against the Plaintiffs without lawful cause and without a legitimate purpose.

124. Rather than being brought for legitimate purposes, the Defendants initiated the afore-referenced proceedings against the Plaintiffs to advance the personal interests of Defendants Fetty, Pickenpaugh, Quinn, Tennant, Rinehart, Stone, Friend, Poling and possibly others unknown to the Plaintiffs at present.

125. In initiating and pursuing the baseless proceedings against the Plaintiffs, it was the Defendants' intent to improperly make the Plaintiffs' lives and conditions burdensome and intolerable to the point that they would abandon, or be compelled to abandon, their property.

126. The initiation and pursuit of the afore-referenced proceedings against the Plaintiffs for improper and illegitimate purposes deprived the Plaintiffs of rights, privileges and immunities guaranteed by the United States Constitution and 42 U.S.C. § 1983.

## FIFTH CAUSE OF ACTION – CIVIL RIGHTS - PROCEDURAL DUE PROCESS
### (As to All Defendants)

127. The failure/refusal of the Defendants to fully implement the appeals procedures set forth in the State Building Code and the State Fire Code, as required by

statute, effectively deprived the Plaintiffs of any meaningful opportunity to challenge the actions of the Defendants, as is set forth more fully in the factual section of this Complaint.

128. The failure/refusal of the Defendants to fully implement said appeals procedures deprived the Plaintiffs of an administrative remedy designed specifically to afford the Plaintiffs, and others similarly situate, of a speedy and inexpensive mechanism to employ to remedy abuses of power and process such as are manifest in the actions of the Defendants as hereinabove set forth.

129. The failure/refusal of the Defendants to fully implement State-mandated appeals procedures caused serious monetary and other injuries to the Plaintiffs as is set forth in detail in the factual section of this Complaint.

130. The failure/refusal of the Defendants to fully implement the appeals procedures mandated by State Law deprived the Plaintiffs of rights, privileges and immunities guaranteed by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

### SIXTH CAUSE OF ACTION – CIVIL RIGHTS – INVERSE CONDEMNATION (As to All Defendants)

131. The conduct of the Defendants, as aforesaid, constitutes an unlawful taking of the Plaintiffs' property under color of law without just compensation. The Defendants denied the Plaintiff's the lawful and peaceful use and enjoyment of their property and made it impossible for the Plaintiffs to continue their ownership and management of Mountaineer Court.

132. In effect, the Defendants condemned Mountaineer Court by permitting the Plaintiffs to make no lawful or permissible use of it, and indicating their unequivocal

intention to maintain and intensify their campaign of harassment, intimidation, defamation and abuse against the Plaintiffs until the Plaintiffs relinquished their ownership of the property.

133. As a direct and proximate result of the foregoing, the Plaintiffs were forced to relinquish their possession, custody, ownership and control of Mountaineer Court, thereby sustaining a loss in excess of $2 million.

## SEVENTH CAUSE OF ACTION – NEGLIGENCE
### (As to All Defendants)

134. The Defendants owe a duty of care to the Plaintiffs, and others so situate, to perform their official duties with reasonable care, skill and diligence.

135. The conduct of the Defendants, as aforesaid, constitutes a negligent breach of the foregoing duty.

136. The foregoing negligent acts and/or omissions of the Defendants were performed by the Defendants at a time when they were acting within the scope of their official employment duties.

137. As a direct and proximate result of the Defendants' aforementioned negligent acts and/or omissions in connection with the performance of their governmental functions, the Plaintiffs have been injured, and sustained damages, in an amount in excess of $2 million.

## EIGHTH CAUSE OF ACTION – OUTRAGE
### (As to All Defendants)

138. In the alternative, the foregoing acts and/or omissions of the Defendants were undertaken intentionally and maliciously.

139. By engaging in the conduct set forth hereinabove, the Defendants have affronted, insulted and abused the Plaintiffs.

140. The conduct of the Plaintiffs, as set forth hereinabove, is outrageous, shocking to the conscience and tortious.

### NINTH CAUSE OF ACTION – NEGLIGENT MISREPRESENTATION
### (As to All Defendants)

141. The Defendants made numerous representations to the Plaintiffs regarding the criteria of applicable Building and Fire Code provisions, as well as necessary remediation measures that the Plaintiffs were ordered to undertake.

142. The Defendants' representations in this regard were erroneous, and the Defendants were negligent in making said representations.

143. The Plaintiffs acted in reasonable and justifiable reliance upon the accuracy and veracity of the representations of the Defendants, to the ultimate detriment of the Plaintiffs.

144. The Defendants are charged with a duty of making accurate and truthful representations to the Plaintiffs, and others so situate, as to matters such as those referenced hereinabove.

145. The Defendants are aware that the Plaintiffs, and others so situate, will act in reasonable and foreseeable reliance upon the accuracy and veracity of said representations.

146. The Plaintiffs are therefore within the foreseeable scope of impact as to the representations they make.

147. The Defendants negligently breached their duty to make truthful and accurate representations to the Plaintiffs, which negligence proximately caused the injuries and damages the Plaintiffs assert they sustained.

### TENTH CAUSE OF ACTION – INTENTIONAL MISREPRESENTATION
### (As to All Defendants)

148. In the alternative, the foregoing misrepresentations of the Defendants were made intentionally and maliciously.

149. The intentional and malicious misrepresentations of the Defendants were the proximate cause of the injuries and damages the Plaintiffs assert they sustained.

### VII. **PRAYER FOR RELIEF**

150. As a result of the conduct of the Defendants, as aforesaid, the Plaintiffs respectfully request that this Honorable Court enter an Order or such Orders as are necessary and proper to:

1. exercise jurisdiction over this action;

2. issue appropriate declaratory relief and preliminary and permanent injunctive relief, including a declaration that the Defendants have violated the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

3. award appropriate compensatory damages;

4. award punitive damages for the outrageous and conscience-shocking conduct of the Defendants so as to deter similar conduct *in futuro*; and

5. grant such other relief as may be appropriate, including reasonable attorneys' fees to the Plaintiffs pursuant to 42 U.S.C. § 1988, litigation expenses and costs.

Respectfully submitted,

Date: March 1, 2010

*/s/ Edward R. Kohout*
Edward R. Kohout
WV State Bar # 4837
2567 University Avenue, 2001
Morgantown, WV 56501
(304) 777-4086 (phone)
(304) 777-4087 (facsimile)

*/s/ Robert O Lampl*
Robert O Lampl, pro hac vice
PA I.D. # 19809
*/s/ James R. Cooney*
James R. Cooney, pro hac vice
PA I.D. # 32706
960 Penn Avenue
Suite 1200
Pittsburgh, PA 15222
(412) 392-0330 (phone)
(412) 392-0335 (facsimile)

Counsel for the Plaintiffs